## THE ISAAC H. TILLYER *v.* THE T. J. SCHUYLER.[1]

### (*District Court, E. D. Pennsylvania.* June 22, 1888.)

**TOWAGE—NEGLIGENCE OF TUG—DEGREE OF CARE REQUIRED.**

The Tillyer, a three-masted schooner, 140 feet long and 35 feet wide, was being towed up the Schuylkill river to Pine street wharf, by the respondent. In order to get there it was necessary to pass through the draw of the B. & O. R. R. bridge. The channel required a change of course two or three hundred yards below the bridge. The water was low at the time, and between the piers was an obstruction. The tug passed so close to the eastward pier that the schooner, following upon, or nearly upon, her course, ran upon the obstruction, and was damaged. The tug claimed that the accident would not have occurred had the schooner been properly handled. The schooner's master asserted that the low state of the water prevented her obeying her wheel. *Held,* that the course of the channel, the state of the water and the obstruction called for more than ordinary care in passing through the draw; and that the tug, having failed to exercise that degree of care, was responsible in damages.

In Admiralty.

*Flanders & Pugh,* for libelant.

*Driver & Coulston,* for respondent.

BUTLER, J. The Tillyer, a three-masted schooner, 140 feet long, 35 feet wide, having a cargo of 869 tons of ice, anchored off the Schuylkill July 2, 1886, about 1 o'clock A. M., consigned to the Knickerbocker Ice Company, of this city. About 9 o'clock of the same morning she was taken in tow by the tug Schuyler, to be conveyed up the Schuylkill to Pine street wharf. She was towed astern by cross-hawsers of 25 to 30 fathoms length. A few hundred yards below the Baltimore & Ohio railroad bridge the channel requires a change of course, first to the east, and then to the west, before entering the draw of that bridge. While there is no serious difficulty in entering and passing through the draw with safety, the character of the channel, the set of the tide, and an obstruction between the piers, call for more than the usual care ordinarily required in towing on this river. The obstruction is at the eastern side of the draw, and extends out six or seven feet from the pier, and is invisible. The tug passed this obstruction safely. How far westward of it she ran is uncertain. The respondent's witnesses disagree respecting it. The schooner approached the draw some feet eastward of the tug's course, encountered the obstruction, and sustained serious injury. The libelant charges the tug with negligently starting when the water was

[1] Reported by C. Berkeley Taylor, Esq., of the Philadelphia bar.

too low, and entering the draw too far eastward. The respondent charges the schooner with negligence in failing to follow the tug.

The last question thus presented may properly be considered first; for if it is determined against the respondent the others will become unimportant. The conclusion in such case, that the respondent was in fault, cannot be avoided. Whether this fault consisted in starting at an improper state of the tide, or in failing to enter the draw further westward, or in something else, is immaterial. It was her duty to know the channel, to be familiar with any obstruction threatening danger, to understand the state of tide at which the tow should start, and all other things necessary to a successful discharge of the duty which she undertook. The only obligation resting on the schooner was to use her best endeavors to follow the tug. That her steering capacity was good is clearly shown, and not questioned. In view of the character of the channel, the necessity for repeated changes of course, and the state and set of the tide at and below the bridge, it is quite plain that she could not constantly follow the track of the tug. In turning westward after passing the rock, (described by the witnesses,) and thus approaching the draw, the tide, and also probably the effect of the towing hawsers, tended to throw her upon a course eastward of the tug's. Did she, however, use her best endeavors to follow? Her master was at the wheel. He testifies that he made all practicable efforts to keep upon the tug's course; that the only order he received after starting, was to starboard his wheel, when running eastwardly near the rock; that he had previously observed the tug's change westward, and had immediately starboarded, for the purpose of following, but that he was so near the bottom the schooner would not obey; that he kept his wheel in this position until he reached the draw, but that in consequence of the state of the water and set of the tide his course was slightly eastward of the tug's. If this testimony is believed it settles the question. I see nothing to justify disbelieving it. It is true, the tug's master says the schooner approached the draw on a port wheel. It is plain, however, that he simply inferred this from the course of the vessel. The inference would not be unreasonable if the vessel was obedient to her helm. The master of the schooner does not depend upon inferences for his statement. He knows the situation of his wheel; and when he says it was starboarded, and that the vessel would not obey, the inference stated by the tug's master should not cast any doubt upon his truthfulness or accuracy. The mate of the schooner, who was stationed forward for the purpose of transmitting orders from the tug, says the schooner's wheel was ported below the bridge (how far below he does not make clear) until she was brought upon the tug's course, and then was "steadied." The wheel was to port properly, and necessarily before passing the rock. It hardly seems probable, however, that this is the time to which the mate refers. If it is not, then his statement also must be attributed to inference from the schooner's course. His business alone was to transmit the tug's orders. The master of the tug says none were given except the one to starboard, before referred to. The master of the schooner says he heard no other order. It cannot be believed,

therefore, that the mate gave an order to port, above the rock, and saw it obeyed. His master says he could see the tug's changes of course, and needed no orders. The mate says, as we have observed, that the last change was "to steady the wheel." The signification of this term is furnished by the master of the tug, who says it means "putting the wheel amidship," which, in this instance, would be to hold the schooner on the tug's course. I repeat, I feel no hesitation in accepting the testimony of the schooner's master respecting the state of the wheel. He alone knows, and there is nothing whatever in the testimony to justify belief that he is either mistaken or untruthful. Again, the respondent's testimony shows pretty plainly that the schooner followed as closely as could well be expected. The master of the tug says the schooner's course was some 20 feet eastward of his. While this would not be very extraordinary, under the circumstances, Mr. Smith put the distance at three to four feet, and the engineer of the tug put it at eight. If Mr. Smith is right, the schooner followed much more accurately than she could have been expected to do; if the engineer is correct, she followed quite as nearly as could reasonably have been expected; and either of these witnesses (Smith and the engineer) is as likely to be accurate as the master.

While it is unnecessary to go further, I feel little hesitation in saying that the accident resulted from starting at an improper time, and in failing to run the tug further westward. The testimony is unusually conflicting, even for a case in admiralty. But that the water was low is an irresistible inference from the fact that the schooner did not properly respond to her wheel. That she did not, I have already determined by accepting the testimony of her master. That the tug did not enter the draw as far to the westward as she should, seems plain from the respondent's own testimony. These witnesses say she entered in the center. In view of the obstruction on the east side, and the tendency of the current to set the schooner over in that direction, this, even if true, was wrong. She could have gone considerably further west, with perfect safety in that direction, and thus have avoided the danger which her course encountered. I believe, however, she entered considerably east of the center. The master of the tug says his vessel passed at least 20 feet westward of the eastern pier. It is not probable that he has understated the distance. Allowing 7 feet for the obstruction, this leaves a space of 13 feet between it and the tug, which was 16 feet in width. Supposing the schooner to have been exactly upon the tug's course, and allowing for her greater width, (35 feet across) this would reduce the space 9½ feet, leaving but 3½ between the schooner and the obstruction. It is thus seen that with the tug passing where her master says she did, and with the current setting eastward, the accident which the schooner encountered was almost, if not quite, inevitable. The testimony of Samuel Smith, "a licensed pilot," who was on the tug, tells a very different story, however, from the master's. It is true, he, as all the other of respondent's witnesses, says they passed through the center of the draw. When more particularly interrogated, however, he says it

was something more than eight feet, he is sure, from the eastern pier; that it was from "five to six feet," he thinks, from the obstruction. It is plain that if this witness' statement is accurate, the schooner, following exactly on the tug's course, would necessarily encounter the obstruction.

A decree must be entered for the libelant.